TOBIN, TOBIN & TOBIN, Appellees, v. ALLEN J. BUDD et al., Appellants.

No. 42134.

December 12, 1933.

Rehearing Denied April 5, 1934.

Nichols, Nichols & Milroy, and Lee, Steinberg & Walsh, for appellants.

Tobin, Tobin & Tobin and Kirkland & St. Clair, for appellees.

Mitchell, J.—In the month of December, 1926, the appellant Allen J. Budd, was owing one Sweeley a note for the principal sum of $3,390, on which there was some accrued interest. For a period of almost two years this note had been in the hands of Tobin, Tobin & Tobin, the appellees, a firm of lawyers practicing law at Vinton, Iowa, for collection. During that period of time the appellee firm had been demanding payment of the note from Mr. Budd, but the only amount which it seems they were able to collect was the interest for one year, which was paid to the appellee firm as attorneys for Sweeley. Budd was financially involved, and Sweeley was anxious to make a settlement with him, even at a discount. Negotiations were had between Budd and John Tobin, in which the amount

of the discount was discussed, and settlement was finally arranged between Budd and John Tobin, one of the appellee firm, acting for Sweeley, in which it was agreed that Sweeley would discount his note $1,000. The question came up as to where Budd could secure sufficient money to make this settlement, and finally, on January 8, 1927, M. J. Tobin agreed to advance the money for Budd. The amount then due on the note was computed in order to ascertain how much would still remain to be paid after giving credit for the $1,000 that Sweeley was willing to allow in the settlement, and it was found that the sum would be $2,882.55. M. J. Tobin on that date made the loan to Budd. The money was paid to Sweeley; the note was cancelled and delivered to Budd. In consideration of said loan, Budd assigned to M. J. Tobin, as collateral security, a certain real estate mortgage on Florida land, and three certain promissory notes, each for $5,000, secured by said mortgage. The transaction of said January 8, 1927, between the said M. J. Tobin and Allen J. Budd, was set out in writing and was introduced in the trial of the case as Exhibit No. 43 and is as follows:

"Agreement.

"Vinton, Iowa, January 8, 1927.

"Whereas A. J. Budd has this day assigned to the undersigned M. J. Tobin three certain promissory notes for $5,000.00 each, dated November 28, 1925, and signed by Charles A. Lyman and whereas the said A. J. Budd has this day assigned to the undersigned M. J. Tobin the certain mortgage of Charles A. Lyman and his wife dated November 28, 1925, securing said three notes by first mortgage lien against the Southwest Quarter and the West Half of the West Half of the Southeast Quarter, all being situate in Section 4, Township 28, South, Range 36, Brevard County, Florida, and whereas the consideration for said assignment is the sum of $2,882.55 for which the said Tobin hereby agrees to finance and pay the certain S. S. Sweeley note for $3,390.00 dated October 19, 1920, which with interest up to this date it is figured amounts to $3,882.55 and whereas the said $2,882.55 is not only to pay Sweeley and cancel said note, but is to pay all costs and expenses of his attorneys, Tobin, Tobin and Tobin in connection therewith and whereas the said M. J. Tobin does this day agree to forward to David Peel for the said A. J. Budd the sum of $100.00 to apply on his account as attorney in foreclosing the

certain mortgage, making a total which the said Tobin has invested in said mortgage note and interest of the sum of $2,982.55

"Now, therefore, it is agreed between the said Tobin and the said Budd that in the excess of the said sum of $2,982.55 with interest from this date at the rate of 7 per cent, together with whatever necessary costs and expenses are needed in the foreclosure of said mortgage, the said Budd is in fact the owner of all of said notes and mortgage securing the same. That is to say Tobin hereby states that his equity and right in said mortgage is the sum of $2,982.55 with interest and necessary costs in foreclosure and that in excess thereof the entire indebtedness represented by the Lyman notes and mortgage belongs to the said A. J. Budd and that upon the payment thereof to the said Tobin, the said Tobin consents and agrees to make a reassignment of said notes and mortgage to the said Budd or a transfer of the property to him, subject to his said claim, whenever the deal has been properly adjusted.

"[Signed]    A. J. Budd.
"M. J. Tobin."

Proceeding in compliance with the directions given to them by Allen J. Budd, the appellee firm engaged a David Peel of Melbourne, Florida, a lawyer, who must be of high standing, for neither side in this case says anything derogatory about Mr. Peel, to foreclose the mortgage in Florida. Mr. Tobin had written Mr. Peel, asking him what his charges would be for foreclosing the mortgage, and Peel had written back that in Florida the usual fee for a foreclosure of a mortgage is 10 per cent of the amount of the mortgage, suggesting that a reasonable division of the fee would be two-thirds to his office and one-third to the Tobin office. He stated in his letter that, if this appeared too large, Tobin could write him again, naming what he believed would be a fee commensurate with the Iowa practice, and that in that case the fee would also be divided between the two offices. According to Tobin's testimony, he talked with Allen Budd about the question of the fee and about the division of the fee, and they finally agreed that $500 would be a fair attorneys' fee and in addition the costs and expenses. Budd denies that Tobin ever told him the exact amount of the fee, and denies that he ever told him there would be any division of the fee between the Tobin office and Peel's office. However, it appears that Mr. Peel proceeded to foreclose the mortgage and that the total amount of the foreclosure

costs, including the $500 attorneys' fee, was $657.92, and that the Tobin firm paid this amount less the one-third of the attorneys' fee which they were to receive from Peel, in accordance with Peel's agreement, which was in the amount of $166.67. Tobin also claimed that he forwarded to Peel as a retainer the sum of $100. This was in compliance with the amount set out in Exhibit 43. It appears also from the record that in order to pay certain taxes, which it was necessary to pay, upon the land in Florida, Tobin advanced the sum of $810.77. There can be little question about this advancement, for there was offered in evidence a written instruction directed to M. J. Tobin, signed by Allen J. Budd, authorizing Tobin to pay this amount of money. This advancement on the taxes was made in November, 1927. There then followed a period of time in which Tobin was attempting to collect the money from Allen J. Budd, but he was unsuccessful in doing this.

Allen J. Budd had a sister who lived at Ames, Iowa, who knew about the Florida land and who had visited in Florida a great many times and had been interested in Florida real estate, and who also was familiar with the financial condition of her brother and the fact that he had pledged the Florida notes as security for the amount of money which had been advanced by Tobin. On the 19th of April, 1930, M. J. Tobin and Allen J. Budd made a trip to Ames, Iowa, and went to the home of Etta M. Budd. They stayed there for a period of several hours. And at that time a note was prepared in the amount of $5,356.63, payable to M. J. Tobin and signed by Allen J. Budd and Etta M. Budd, said note to become due in one year from date. The note was assigned by M. J. Tobin to Tobin, Tobin & Tobin. No claim was or is made by the appellees that they were innocent purchasers; on the contrary, the money represented in the note sued upon was the appellees' money, and they at all times were the real owners of the note in question. When the note became due, both Allen J. Budd and Etta M. Budd were notified, and there were some letters back and forth between the parties, the appellees insisting that they would have to have this obligation paid, and the appellants at all times saying that they were doing their best to pay the said obligation. After waiting a period of more than eighteen months to collect the obligation and being unsuccessful in doing so, the appellees on December 11, 1931, brought a suit upon this note, aided by attachment, and filed an attachment bond in the usual form in the penal sum of $18,000. They procured a writ of attachment

from the district court of Benton county and sent it to the sheriff of Story county, to be served against the property of Etta M. Budd. It was the claim of Etta M. Budd that the sheriff of Story county, in compliance with the direction of the appellees, levied upon real estate and personal property of the value of over $20,000, including the household furniture of the appellant. To the petition of the appellees, the appellant Allen J. Budd filed a separate answer, admitting the execution of the note and setting up the defense of fraud against the note sued upon, and also filed a counterclaim for damages on account of wrongful attachment. Etta M. Budd also filed a separate answer, admitting the execution of the note and setting up the defense of fraud against the note sued upon, and also a separate counterclaim for damages on account of wrongful attachment. It appears from the record that, although Allen J. Budd filed a counterclaim for wrongful attachment, which counterclaim was verified, and in which he charges that his home was levied upon and that he was greatly wronged and damaged, after he had gone to the trouble of filing the counterclaim, he discovered that the writ of attachment as against the property of Allen J. Budd was never issued and no property of his was levied upon, and thus ended his counterclaim for damages for wrongful attachment. The case proceeded to trial, and, after the evidence had been introduced, both sides having rested, the court sustained the motion of the appellees for a directed verdict as against Allen J. Budd and Etta M. Budd upon the note sued upon, and submitted the case to the jury upon the claim of Etta M. Budd for damages on her counterclaim for wrongful attachment. The jury returned a verdict in favor of the appellees and against the appellant Etta M. Budd on her counterclaim for wrongful attachment. From the adverse rulings of the court and the verdict of the jury, the appellants have appealed to this court.

 It is the claim of the appellants that a fiduciary relationship existed between M. J. Tobin and the appellants, that the relationship was one of attorney and client, and that the burden was upon appellees in this case to show the fairness in the dealing between Tobin and Budd to justify the settlement.

Thus we must see what the record discloses. Was the relationship that existed between the appellees and Allen J. Budd one of attorney and client at the time that the first money was loaned by M. J. Tobin to Allen J. Budd? It appears without dispute that the Tobin firm had been employed to collect for one Sweeley a certain

indebtedness which Allen J. Budd owed to Sweeley. This collection seems to have been in the hands of the appellee firm for a period of two years before the money was loaned by M. J. Tobin to Budd, which was on January 8, 1927, and that during that period of time the appellee firm had been endeavoring to collect this money from Budd for their client, Sweeley. At that time the appellee firm did not represent Budd; in fact, they had a claim adverse to Budd's interests. They were the attorneys for Sweeley, attempting to collect money from Budd. So there can be no question that, at the time M. J. Tobin loaned the first money to Budd, which was in January, 1927, the firm of Tobin, Tobin & Tobin was acting as attorney for Sweeley and not as attorney for Budd. Even Budd in his own testimony admits this when he testified as follows:   .

"Q. For two years Tobin, Tobin & Tobin as Sweeley's attorneys had been trying to collect the Sweeley note from you? A. Yes sir. I knew two years before that John Tobin as attorney for Sweeley had collected one year's interest and he collected the next year's interest on the Sweeley note from me. John had been pressing me to pay the note. When I entered into the contract on the 8th day of January I understood that Tobin, Tobin & Tobin were demanding of me the sum of $2,882.55 on the Sweeley note to cancel it. When I signed the agreement, Exhibit 43, I knew the face of the Sweeley note was $3,390.00 and I knew that the note with interest figured to $3,822.55. I was to pay Tobin, Tobin & Tobin $2,882.55 as attorneys for Sweeley is what you told me. I knew that on that day the foreclosure of the mortgage in Florida had not been commenced."

A number of months before January 8, 1927, John Tobin and Allen J. Budd had had various conversations in regard to the Sweeley matter and had discussed the proposition that the Sweeley note could be settled for $1,000 less than the actual indebtedness. Budd was making a desperate effort to find some source from which he could obtain the money in order to get the benefit of that great reduction, and on January 8, 1927, M. J. Tobin loaned to Budd the sum of money which, as shown by Exhibit 43, was the amount necessary to settle the Sweeley note. Tobin did not loan that money to Budd as an attorney. The relationship was not one of attorney and client; it was the relationship of creditor and debtor. Budd was satisfied with the adjustment of the Sweeley matter; he was securing a discount of $1,000. It was to his interest if possible to borrow the

money to make this settlement. Tobin loaned him the money for that purpose. Budd afterwards employed Tobin on another matter, to wit, the foreclosing of the mortgage on the Florida land. The foreclosure of the mortgage on the Florida land had nothing to do with the Sweeley settlement. The Florida foreclosure proceeding was completed, and in December, 1927, the commissioner's deed was executed. Thereafter there is not one single word in the record to show that the relationship of attorney and client existed after December, 1927, between appellee firm or any member of the firm and Budd. In fact, the record shows that that relationship did not exist and that the appellee firm had cases against Budd. We find that in 1928 the Tobin firm represented a Shellsburg bank in a case against Allen J. Budd and also against Etta M. Budd. The appellants in this case rely upon a fiduciary relationship, and it devolved upon them to prove the existence of such relationship. There was a relationship of attorney and client in 1927 between the parties, but that relationship of attorney and client in connection with the Florida foreclosure terminated with the issuance of the commissioner's deed in December of 1927. That was a matter of more than two and a half years before the note in question in the case at bar was signed. After December, 1927, there is no evidence in the record of any fiduciary relationship existing between the appellees and the appellants. The appellees did not act as attorneys for the appellants; in fact, the record discloses that the appellees acted as attorneys for parties who had claims against the appellants, and, instead of representing the appellants, appellees were on the opposite side of the table. It thus appears that at the time the note was signed there was no fiduciary relationship between the appellees and the appellants.

We will next consider the charges of fraud made in the answers of both appellants. The items alleging fraud are as follows: (1) That M. J. Tobin misrepresented the value of the Florida land; (2) that appellees committed fraud in accepting a fee of $166.67 from Mr. Peel, the Florida lawyer; (3) that M. J. Tobin committed fraud in connection with the $100 which he agreed to send as a retainer to Attorney Peel; (4) that fraud was committed in connection with the interest, which was charged at the rate of 7 per cent; (5) the Sweeley transaction.

It is of course so well known that citation of authorities is not needed, that fraud will never be presumed, and that the law places upon the appellant, the appellant having pleaded the fraud, the

burden of proving the same by a preponderance of the evidence. We must thus look to the record to ascertain what proof the appellants furnished of the alleged fraud.

The first charge of fraud is that M. J. Tobin misrepresented the value of the Florida land. It is the claim of the appellant Etta M. Budd that M. J. Tobin had information superior to that of Etta M. Budd in regard to the value of the Florida land and in regard to a certain drainage district; it appearing in the record that the Florida land was very wet and that drainage was necessary, the appellant Etta M. Budd claiming that M. J. Tobin knew at the time that Etta M. Budd signed the note that the Florida land was of little value and that the drainage district was in questionable financial condition, and that it was the duty of M. J. Tobin to disclose to Etta M. Budd the information which he had in regard to the value of the land and the drainage district, and that, instead of disclosing this to Etta M. Budd, he misrepresented the value of the land and gave her to understand that it was of great value, far in excess of the amount of the note that she signed with her brother Allen. The record shows that Allen J. Budd was a man along in years; that he was a graduate of the Iowa State College; that he was a man of large business experience and the owner of a great deal of property, consisting of real estate in North Dakota and in Florida, and a large home in Shellsburg that cost him some $18,000; that, in addition to this, he was the owner of stock in a bank and in a grain and lumber company, and had been actively engaged for years as a cattle, hog, and sheep buyer; that he had visited Florida on several occasions, as far back as in 1914, and on his various trips to Florida would stay two, three, or four months, and usually around Melbourne, where the Florida land which is in question was located; that he was in Melbourne, Florida, for three months in 1929 and saw the land frequently; that in 1929 he sold the land, being the 200 acres of Florida land in question in this case, for the sum of $40,-000 and gave a deed, receiving part cash and a first mortgage of $15,000 upon the Florida real estate, consisting of three notes, being the three notes which he turned over as security to M. J. Tobin. The record shows that the man who Budd claims misrepresented the Florida land and who failed to disclose facts which Budd claims he should have disclosed, to wit, M. J. Tobin, never was in Florida but once in his life; that he never was in or near Melbourne but one day in his life, and the only time he ever saw the land was when he

drove by it on that day with some friend of his, and all he knew about the land was what he saw as he rode by it in an automobile. Certainly, in the face of such a record, no one could claim that M. J. Tobin misrepresented the Florida land to Allen J. Budd or failed to disclose any information which he had.

As to Etta M. Budd the record shows that she is a lady of unusual education, travel, business capacity, and experience. She too is a college graduate, and afterwards she studied art and traveled. At the time of the trial she owned property in Ames, Iowa, Melbourne, Florida, and a farm in Dakota. She bought and sold real estate, building three houses in the summer of 1920. She borrowed money, gave notes and mortgages, and, in addition thereto, loaned money, some of the loans running as high as $3,000, taking mortgages to secure same. She testified that she made loans for her mother and during one year she handled $25,000 in the making of loans to various people. She made various and numerous trips to Florida. In 1916 and in 1917 she was there for three months. She was in Melbourne, Florida, in the years 1918 and 1919, four months at a time, and on these trips she saw the land in dispute in this case at different times and under different circumstances and talked about it with her brother and others frequently. She was in Florida for three months in the years 1929 and 1930, and made the same visits to and made investigations of and had talks with her brother Allen and others about the land in question. She testified in 1927 there was a great deal of water standing on the land, due to the drainage work. "I saw the land a number of times that year and also in 1929 and it was covered more or less with water." "There was water on different parts of the 200 acres. In 1929 there was a large lake of water just west of the 200 acres." She talked with friends of hers at Melbourne; wrote letters to various friends of hers down there, including men connected with the drainage district. She knew about her brother Allen selling the land, and she had talked with her brother Allen about buying 150 acres of the land from him. About two months before she signed the note in question in this case, she had been in Melbourne, Florida, and had seen the land, discussed the drainage and possible value of same, and on February 23, 1930, she wrote to M. J. Tobin the letter, Exhibit 47, as follows:

"Melbourne, Florida, February 23, 1930.
"Mr. M. J. Tobin, Vinton, Ia.
"Dear Sir:—Just received a letter from my brother Allen also

your letter to him. I am very glad that you are coming down to Florida and will stay at Melbourne. I think that it will be a good thing to have a lawyer here. As you know conditions in Florida are not the best. I have been investigating things and have found out quite a lot. I want to have a talk over this business with you first. So please let me know when you arrive and I will try and meet you. As far as I know all taxes drainage are to be paid up to this years, and they are to be paid by April 1st. I must say that I was somewhat disappointed with same thing. That drainage Co. have not come up to their agreement. Will tell you rest when you come.

"I am respectfully

"Etta M. Budd."

For some reason or other, not disclosed by the record, after writing the above letter, she left Melbourne before Mr. Tobin arrived. She paid taxes on this land in Florida. She corresponded with the officials of the drainage district, and even after this suit was commenced she wrote a letter to Mr. Tobin, in which she said, among other things: "It was my desire to save that valuable land in sympathy for Allen that prompted me." The only thing that Etta M. Budd claims M. J. Tobin said to her before she signed the note on the day that Tobin had gone to Ames with her brother Allen, was, according to her testimony, as follows: "He said he had been in Florida. He had had a nice time. He had visited the land down there. That is, had been to see it. He said it was a valuable property. He asked me if I would sign the note with my brother and said he considered the land worth much more than the face of the note and that I wouldn't lose anything by doing so. I believed his statements."

In face of such a record, where the man who is claimed to have been guilty of the fraud charged had only seen the land on one occasion and only then driving by it in an automobile, while Etta M. Budd had known the land for years, was a woman of great business experience, had talked with men of standing in Florida in regard to the value of the land, had written and consulted with people interested in the drainage district, and who only claims that the alleged fraud of which M. J. Tobin is supposed to be guilty was the statement that he had stated it was a valuable property and that she would lose nothing by signing the note, no one can read this record and say that M. J. Tobin had superior knowledge to Allen J.

Budd and Etta M. Budd in regard to the value of the Florida land and the drainage district. Allen J. Budd and Etta M. Budd knew the Florida land; they believed in it. Unfortunately their judgment in regard to the value of the Florida land was wrong, but that judgment was their own judgment. M. J. Tobin had nothing to do with convincing them that the Florida land was valuable property. The record clearly shows that M. J. Tobin was not guilty of any fraud of any kind or description as far as misrepresenting the Florida land was concerned. He did not misrepresent it, nor did he fail to disclose any information which he had which he should have disclosed. The truth of the matter is both Allen J. Budd and Etta M. Budd had far more information than M. J. Tobin ever had.

The second charge of fraud is in the accepting of a fee of $166.67 from the attorney in Florida. There is no dispute in the record that Allen J. Budd authorized and directed the appellee to commence foreclosure of the mortgage on the land in Florida. It was of course necessary for Mr. Tobin to secure associate counsel in Florida properly to protect the interests of Allen J. Budd. This he did by writing to Mr. Peel, who is a practicing attorney in Florida. Mr. Tobin, in the interest of his client, Mr. Budd, first desired to ascertain what would be the charge in Florida for the foreclosure of the mortgage, and Mr. Peel wrote, informing Mr. Tobin the usual charge in Florida was 10 per cent of the amount of the mortgage. This naturally seeemed high to Mr. Tobin, who is a practicing attorney in the state of Iowa, where attorneys do not charge any such fees for foreclosing mortgages, for, on the basis of Mr. Peel's letter the fee would have been $1,500. After some correspondence the appellee secured an agreement with Mr. Peel to foreclose the mortgage upon the basis of $500 as the attorneys' fees. In addition to said attorneys' fees, Budd was to pay the actual costs of foreclosure. One-third of the attorneys' fee was to be given by Mr. Peel to the appellee firm as their fee for forwarding the business. There is some dispute in the record as to whether or not Mr. Budd knew what the exact fee was to be. There was no provision in the Florida mortgage for mortgagors to pay attorneys' fees in case of foreclosure. The mortgage was foreclosed by Mr. Peel, and Mr. Peel submitted an itemized statement showing the costs and the attorneys' fees of $500, which totaled $657.92. Tobin testified that this was all explained to Allen J. Budd and that he understood it perfectly and had agreed to same. Budd denies this. But the written agreement,

Exhibit 43, which was drawn up on January 8, 1927, authorized and ordered the appellee to pay to Mr. Peel "whatever necessary costs and expenses are needed in the foreclosure of said mortgage." There is no question in this record that Mr. Peel's fee and costs were as represented by Mr. Tobin. Mr. Peel paid to Mr. Tobin as forwarding attorney one-third of the attorneys' fee, to wit, the sum of $166.67, and the undisputed record shows that the only attorneys' fee the appellee firm received for foreclosing the mortgage and handling the transaction for Budd was the sum which was received from Mr. Peel, to wit, the sum of $166.67; that Allen J. Budd never paid one single penny to the Tobin firm for services rendered in connection with the said foreclosure. In view of such a record, the appellee firm could not be charged with fraud in receiving one-third of the fee from Mr. Peel for forwarding this business to Mr. Peel.

The next charge of fraud is that the appellees were guilty of fraud in that they claimed to have sent to Mr. Peel $100 as a retainer for the foreclosure suit. The record shows that the appellees believed that the $100 was sent; M. J. Tobin so testified. However, it seems that they were unable to locate any check or voucher or letter showing the transmittal of the said amount to Mr. Peel, and in view of that fact at the very commencement of the lawsuit the appellee firm asked that the appellants be credited with the sum of $100 plus interest from January, 1927, to the date of the trial, or the sum of $137.22. There is no showing in the record that the $100 had not been forwarded to Mr. Peel, but the appellees in their desire to be fair, being unable to produce the voucher or letter showing the transmittal of the money, asked the court to credit the appellants with that amount, and the court, in compliance with their request, did so credit the appellants. In the face of such a record, certainly there was no fraud on the part of the appellees proved.

The next alleged fraud is the fact that the appellees charged 7 per cent interest upon the various items which we have discussed —the item of $2,882.55 from January 8, 1927, to April 1, 1930 (which was the amount which was loaned by M. J. Tobin to Allen J. Budd to settle the Sweeley matter); the item of $810.77 from January 3, 1928, to April 1, 1930 (which was the amount that M. J. Tobin paid for taxes upon the Florida land and which amount was ordered paid by Allen J. Budd, in writing); and the amount of $657.92 (which was the amount that Tobin paid to Attorney Peel to foreclose the mortgage). It is the claim of the appellants that the

appellees were guilty of fraud because they charged 7 per cent, which was 1 per cent more than the legal rate allowed in this state, and that the charge of the extra 1 per cent was accompanied by concealment, over-reaching, and fraud. The record of course shows that the written contract, which is Exhibit 43, provided "the rate of interest shall be seven per cent per annum." Allen J. Budd testified that he understood he was to pay 7 per cent on the amount of the taxes which Tobin advanced for him. So the only item upon which 7 per cent is in conflict is the amount of the attorneys' fee and the costs advanced by Tobin. It is the claim of the appellees in the record that before the note was signed by Allen J. Budd and Etta M. Budd, a statement was furnished to the appellants showing how the same was arrived at and that 7 per cent was charged upon this item. That statement was introduced in evidence at the time of the trial. Certainly there is no showing that fraud was practiced upon these appellants in regard to the charge of 7 per cent upon the various items.

Finally we come to the last alleged ground of fraud; that is, that it was the duty of Tobin fully to disclose to Budd all of the facts of the settlement with Sweeley, that is, the settlement which Tobin as attorney for Sweeley made between Budd and Sweeley. The appellants do not say that there was any fraud in that settlement, but they say that it is fraud because Tobin does not disclose all of the facts covering the settlement, and, among other items which they seem to be very interested to know, is what attorney's fee Tobin charged Sweeley for making the settlement. Tobin at the time that he made the settlement was the attorney for Sweeley and not for Budd. Budd knew this, and in writing acknowledged it. There is not in the record one single bit of evidence that even points to any fraud on the part of Tobin as far as the Sweeley matter is concerned. Budd was indebted to Sweeley on a note amounting to $3,882.55. Budd was the owner of substantial property, which at least Budd believed was valuable, including the $15,000 worth of notes secured by the mortgage on the Florida land. The Sweeley note was settled for $1,000 less than the face value. In other words, in the Sweeley transaction, in which Budd claims to have been defrauded, he was actually saved the sum of $1,000, for the payment of which he was legally obligated at a time when he thought he had property sufficient to pay it. Certainly, there was no obligation on the part of Tobin, attorney for Sweeley, to account or to disclose

to Budd the settlement made between Sweeley and Tobin covering the amount of the attorney's fee which Tobin charged Sweeley. Tobin was Sweeley's attorney; he had a perfect right to charge him for the services he performed for Sweeley. What that amount was was no one's business except Sweeley's and Tobin's. Sweeley is not in here complaining. If he is not satisfied, the record does not show it. Allen J. Budd was not damaged by the Sweeley settlement; he was benefited. And there was no duty on the part of the appellees to disclose what the settlement between Sweeley and the appellee firm was in regard to the amount of the attorney's fee which was paid by Sweeley to Tobin.

Thus we have carefully taken up each one of the alleged grounds of fraud which the appellants set forth. There is not in the record any competent evidence to sustain any one of the charges of alleged fraud on the part of the appellees. The only complaint really that can be made against the appellees in this case is that they stepped out of the field in which they practice, to wit, the legal profession, and into the field of the banker, and loaned to the appellants the money which they now seek to recover. It must be kept in mind that that which the appellees are seeking to recover is not attorneys' fees charged against the appellants. It is actual money which was loaned by the appellees to the appellants. The only amount which the appellees received as attorneys' fees was the sum of $166.67 which Peel allowed them out of his fee for forwarding the foreclosure of the Florida land to his office. The appellants never paid the appellees one single penny. The appellants admitted the execution of the note. They set up as their defense the grounds of fraud, which have been carefully considered in this opinion. They have failed to prove any fraud of any kind or description, and at the close of the evidence the lower court rightfully directed a verdict for the appellees.

We come now to the question of the counterclaim. The appellants complain of certain instructions which were given by the court to the jury. We have given careful consideration to the appellants' complaint and find there was no error in same that would justify this court in disturbing the verdict which was rendered by the jury.

The appellants also cite some forty errors with reference to the exclusion or admission of evidence. Only a few of these errors were argued by the appellants. Careful consideration has been given

by this court to these objections, and we find no error of which the appellants can justly complain.

Finally, the appellants complain because the court overruled the challenge for cause to two of the jurors at the time the jurors were examined for cause. One of the jurors, Mrs. Brehm, was challenged because she and her husband lived upon the farm owned by John Tobin, who was a plaintiff in the case. It appears that, after the court overruled the challenge for cause, the appellants then exercised one of their peremptory challenges, and Mrs. Brehm was excluded as a juror. In the case of Ingebretsen v. M. & St. L. Ry. Co., 176 Iowa 74, on page 80, 155 N. W. 327, this court said:

"So also, if a challenge for cause which ought to be sustained is erroneously overruled, there is no prejudice to the challenger if he still has the opportunity to get rid of the objectionable juror by peremptory challenge. This has so often been held by the courts as not to be open to debate. It follows of necessity that, where the party has the opportunity to exclude the juror by peremptory challenge, and does in fact so remove him, the overruling of the challenge for cause will afford no ground for reversal of the judgment finally rendered."

So, in the face of the rule quoted from the above case, the appellants cannot complain here of failure to excuse Mrs. Brehm on challenge for cause.

Appellants also complain that the court did not excuse the juror Schmidt. It is alleged the relationship of attorney and client with Mr. Kirkland, who was one of the attorneys for appellees, disqualified this juror. The only matter he had ever consulted Mr. Kirkland about was the examination of an abstract of title. Mr. Kirkland had completed and delivered his written opinion on the examination of the abstract. There appears to have been nothing left for Mr. Kirkland to do except to collect his fee. It was incumbent upon the appellants, in urging the challenge, to show facts bringing the challenge within the statute. The record also shows that there is a conflict in the evidence in regard to the alleged juror's disqualification, and, under the holdings of this court, the trial court is the judge of the facts on the question of existence of a ground for challenge. State v. Harding, 205 Iowa 853, 216 N. W.

756. And in this case there is no showing that the trial court abused that discretion.

Thus it appears that the trial court was right in directing the verdict upon the note sued upon as against the appellants; the appellants having failed to prove fraud on the part of the appellee. In regard to the counterclaim of Etta M. Budd for wrongful attachment, that question was fairly submitted to a jury, who were properly instructed by the court, and who, after listening to the evidence and instructions of the court, returned a verdict in favor of the appellees.

We find no error in this record, and the judgment of the lower court must be, and it is hereby affirmed.

ALBERT, C. J., and EVANS, STEVENS, CLAUSSEN, KINDIG, ANDERSON, DONEGAN, and KINTZINGER, JJ., concur.