STATE of Iowa, Appellee,

v.

Robert Anthony WILLIAMS, Appellant.

No. 61228.

Supreme Court of Iowa.

Nov. 14, 1979.

Rehearing Denied Dec. 13, 1979.

Gerald W. Crawford, Des Moines, and Robert Bartels, Iowa City, for appellant.

Thomas J. Miller, Atty. Gen., Faison T. Sessoms, Asst. Atty. Gen., Dan L. Johnston, Polk County Atty., Robert J. Blink and Rodney J. Ryan, Asst. Polk County Attys., for appellee.

Considered by LeGRAND, P. J., and REES, HARRIS, ALLBEE, and McGIVE-RIN, JJ.

ALLBEE, Justice.

This is an appeal by Robert Anthony Williams from his conviction, on retrial, for first degree murder, a violation of sections 690.1 and 690.2, The Code 1966. The charge arose out of the death of Pamela Powers, which occurred on December 24, 1968.

Williams was initially tried and convicted of this crime in 1969. On appeal from that conviction he contended that the police had obtained certain statements from him in an unlawful manner and that those statements should have been suppressed. This court rejected his argument and, in a five to four decision, affirmed the conviction. *State v. Williams*, 182 N.W.2d 396 (Iowa 1970). Defendant then petitioned the United States District Court for the Southern District of Iowa for a writ of habeas corpus. That court held that defendant's statements had been obtained in violation of his right to counsel and privilege against self-incrimination and sustained the petition. *Williams v. Brewer*, 375 F.Supp. 170 (S.D.Iowa 1974). A divided panel of the court of appeals affirmed. 509 F.2d 227 (8th Cir. 1974). After petitions for rehearing and rehearing en banc were denied by the court of appeals, the Supreme Court granted certiorari, 423 U.S. 1031, 96 S.Ct. 561, 46 L.Ed.2d 404 (1975), and affirmed, also by a vote of five to four. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977).

The facts out of which the prosecution arose have been set out in the prior opinion of this court and in the opinions of the court of appeals and Supreme Court. Factual

statements in this opinion will therefore be limited to those necessary to the discussion of the individual issues which defendant has raised. Those issues are considered in the order in which they were presented by his brief.

I. *Rejection of defendant's choice of appointed counsel.* Defendant first complains because trial court refused to appoint Sheldon Otis, of San Francisco, California, as co-counsel for the defense. He claims that as an indigent defendant he had at least a qualified right to select particular attorneys for his defense. Mr. Otis is a member of the bars of California and Michigan with extensive experience in felony trials, and had previously appeared in an Iowa criminal case.

Defendant applied for appointment of counsel on April 14, 1977, stating that he was indigent, that his counsel in the federal habeas corpus action, Robert Bartels, could not represent him in this trial due to previous commitments, and that Mr. Otis was willing and able to undertake representation of defendant. He also requested the appointment of co-counsel for Mr. Otis and stated that Gerald W. Crawford of Des Moines was willing to accept such an appointment. Attached to the application was Williams's affidavit of indigency and a supporting certificate by a counselor at the state penitentiary, where Williams was incarcerated. No request for a hearing was contained in the application.

On April 21, 1977, District Judge Ray Hanrahan entered an order appointing counsel for defendant. The order recited that the court had conferred with defendant's prior counsel, Mr. Bartels, that defendant was indigent and required appointed counsel, and that prior counsel could not continue his representation. It also recited the court's findings that defendant's interests would be better served by appointment of local counsel and that pre-trial matters and the orderly processing of the case would be facilitated by local counsel. It therefore appointed Roger P. Owens and John C. Wellman, both of the Polk County Offender Advocate's Office, and Gerald W. Crawford as co-counsel for defendant.

Then, on April 27, Williams filed a motion for substitution of counsel, requesting that Mr. Otis be appointed in place of either Mr. Owens and Mr. Wellman, or Mr. Crawford. This motion requested a hearing. Defendant alleged that he was fearful of the effect of community pressure and publicity upon Des Moines counsel and asserted that he had a right under the State and Federal Constitutions and section 775.4, The Code 1977 (current version at Iowa R.Crim.P. 8(1) & 26), to choose the attorneys to be appointed for him. The motion argued that trial court's concerns about pre-trial matters and the orderly processing of the case could be adequately met by the appointment of local co-counsel and stated that Mr. Otis would not claim any transportation expenses. Thus his services would incur no special expense for the state. The motion also noted that Judge Hanrahan had stated that Mr. Otis would have been permitted to appear if he had been retained by Williams.

District Judge J. P. Denato treated the motion as a motion for reconsideration of the ruling on defendant's application for appointment of counsel. Because the motion was treated as one for reconsideration, and because the original application did not demand a hearing, defendant's request for a hearing at this juncture was denied. The court then denied the motion on its merits.

In denying the motion, Judge Denato found that counsel appointed by Judge Hanrahan were competent, a quality which, in Judge Denato's opinion, included the ability to remain unaffected by pressure and publicity. The court rejected defendant's suggestion that local co-counsel could provide for the orderly disposition of pre-trial matters, reasoning that those matters are often critical to the defense and ought to be the responsibility of chief trial counsel. Further, Judge Denato noted that Mr. Otis "would be involved in trial in California well into May," which would be an impediment to the speedy disposition of the case. Trial court noted that it had not been established, at the time of the ruling on the original application, that Mr. Otis would

serve for local fees only, without charging for travel time, but did not rely on this fact. Finally, the court referred to the plan for appointing criminal defense counsel in Polk County and pointed out that Mr. Otis was not on the appointment list.

Defendant now presents four arguments which he insists support at least a qualified right on the part of indigent criminal defendants to choose particular counsel to represent them. The first is based on the sixth amendment and *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). The second is an equal protection argument. The third is based on due process, which also supports his claim that he was entitled to a hearing on the question. His final argument arises out of the language of section 775.4, which provides for appointment of counsel for indigents.

 While there is an absolute right to counsel, no defendant, indigent or otherwise, has an absolute right to be represented by a particular lawyer. *See, e. g., United States v. Vargas-Martinez,* 569 F.2d 1102, 1104 (9th Cir. 1978); *United States v. Poulack,* 556 F.2d 83, 86 (1st Cir.), *cert. denied,* 434 U.S. 986, 98 S.Ct. 613, 54 L.Ed.2d 480 (1977); *United States v. Dinitz,* 538 F.2d 1214, 1219 (5th Cir. 1976), *cert. denied,* 429 U.S. 1104, 97 S.Ct. 1133, 51 L.Ed.2d 556 (1977); *cf. United States v. Buttorff,* 572 F.2d 619, 627 (8th Cir.), *cert. denied,* 437 U.S. 906, 98 S.Ct. 3095, 57 L.Ed.2d 1136 (1978); *United States v. Hinderman,* 528 F.2d 100, 102–03 (8th Cir. 1976) (no right to representation by laymen). A defendant's right to choose particular counsel is circumscribed by trial court discretion, which may be exercised to effectuate an orderly disposition of the case. *United States v. Dinitz,* 538 F.2d at 1219; *Harling v. United States,* 387 A.2d 1101, 1104 (D.C. 1978). Thus, trial courts have generally been vested with broad discretion in determining the particular attorney to be appointed to represent an indigent defendant. *See, e. g., Drumgo v. Superior Court,* 8 Cal.3d 930, 106 Cal.Rptr. 631, 506 P.2d 1007 (1973); *Baker v. Commonwealth,* 574 S.W. 2d 325, 326–27 (Ky.Ct.App.1978); *State v. Hollins,* 512 S.W.2d 835, 838 (Mo.Ct.App.

1974); *People v. Medina,* 44 N.Y.2d 199, 207, 404 N.Y.S.2d 588, 592–93, 375 N.E.2d 768, 772 (1978); *Commonwealth v. Chumley,* 482 Pa. 626, 646 n.3, 394 A.2d 497, 507 (1978), *cert. denied,* 440 U.S. 966, 99 S.Ct. 1515, 59 L.Ed.2d 781 (1979); *Brewer v. State,* 4 Tenn.Ct.Cr.App. 265, 270, 470 S.W.2d 47, 49 (1970); *Watson v. Black,* 239 S.E.2d 664, 668 (W.Va.1977); *State v. Shears,* 68 Wis. 2d 217, 259–60, 229 N.W.2d 103, 124 (1975); *Irvin v. State,* 584 P.2d 1068, 1070 (Wyo. 1978). *See generally* Annot., 66 A.L.R.3d 996 (1975). In fact, that discretion has been interpreted to encompass the adoption of policies which specifically preclude the defendant from selecting his lawyer. *United States v. Davis,* 604 F.2d 474, at 478–479 (7th Cir. 1979).

 Because we are impressed by the overwhelming support for the rule, we hold that trial courts have broad discretion, both in the first instance, and in considering a motion for substitution of counsel, in choosing the particular lawyer to represent an indigent defendant. The concerns stated by both district judges in this case regarding the need for local counsel to deal effectively and promptly with pre-trial matters are reasons sufficient to characterize their actions as being well within the boundaries of sound discretion.

 Defendant's specific arguments remain to be answered. His first, based on the sixth amendment, is summarized by this passage from his brief:

In *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), the Court recognized that the right to counsel was a *personal* right that included the right to proceed *without* an attorney in a criminal case. Surely if the defendant has the right to choose to represent himself despite the serious practical problems this might cause at trial, he also has the right to choose to have a particular attorney represent him, . . . . .

This argument entirely ignores the basis of *Faretta.* The Court found in that case that the right to proceed without counsel was an *independent* right. *See* 422 U.S. at 819 n.15, 95 S.Ct. at 2533, 45 L.Ed.2d at 572.

Because the source of the right of self-representation in the sixth amendment is independent of the right to assistance of counsel, the right to self-representation does not imply a right to choice of particular counsel. *United States v. Dolan*, 570 F.2d 1177, 1183 (3d Cir. 1978).

■ The equal protection claim is without merit because the right to choice of counsel by both indigent and non-indigent defendants is limited by trial court discretion to maintain an orderly trial process. Trial court, in both rulings, placed reasonable reliance upon such a ground in denying defendant's request for Mr. Otis.

■ Defendant next claims that due process gives him both the right to choose his counsel and the right to a hearing on the matter. No authority is cited for the proposition that a substantive independent right of choice of counsel is a component of due process. Nor is any likely to be found. Rather, such a qualified due process right may exist by incorporation of the right to counsel established by the sixth amendment. And, insofar as that is true, defendant's contention has already been answered.

■ Nor does the claim that due process gave defendant a right to a hearing on this matter have merit. First, it is doubtful that defendant has established an entitlement to a choice of particular counsel. In the absence of such an entitlement, the state is not required to give him procedural due process. *Leis v. Flynt*, 439 U.S. 438, 442, 99 S.Ct. 698, 701, 58 L.Ed.2d 717, 723 (1979) (per curiam).

Moreover, the facts of this case do not show any need for a hearing. None of the facts alleged in the application or the motion were controverted. Both judges appear to have accepted those facts as established.[1] The application did not request a hearing, although such a request was required by the local rules. The rulings both indicated that each judge conferred with Mr. Bartels, who had prepared both the application and the motion. In addition, defendant submitted a brief in support of his motion for substitution. Finally, defendant gives no suggestion or hint as to what further benefit he might have gained by a formal hearing. While it would have been preferable to grant defendant a hearing when it was requested, if for no other reason than to enable the court to exercise a fully informed discretion, failure to do so on the facts of this case did not deny defendant due process.

■ The fourth ground upon which defendant seeks to base his right to a choice of counsel is the text of section 775.4.[2] He argues that because the "allow him to select" language is the first alternative listed, it ought to be preferred. The statute establishes in the trial court the power to appoint counsel by either of two alternative means. We find no stated preference in the statute for either alternative. Trial court exercised its discretion by selecting one of the two listed methods. Its selection was not an abuse of that discretion.

II. *Use of the inevitable discovery doctrine.* In the second division of his brief Williams addresses the issue of whether trial court should have suppressed evidence relating to the body of the murder victim, including clothing found on the body and results of tests performed on the body. His argument is that suppression was required because the evidence was the "fruit of the poisonous tree." That is, the body was discovered as a result of statements by defendant which the police obtained in an unlawful manner. The State answers this contention by arguing that the search which

---

1. As we have noted, Judge Denato did rule that it had not been established at the time of the ruling on the first application that Mr. Otis would serve for local fees only. That matter, however, was not mentioned by either judge as a factor in the exercise of discretion and Judge Denato specifically discounted its importance.

2. **775.4 Right to counsel.** If the defendant appears for arraignment without counsel, he must, before proceeding therewith, be informed by the court of his right thereto, and be asked if he desires counsel; and if he does, and is unable to employ any, the court must allow him to select or assign him counsel, not exceeding two, who shall have free access to him at all reasonable hours.

was under way for the victim would have discovered the body in any event, even absent defendant's assistance.

■ Thus, this case squarely presents the question of whether the doctrine of inevitable discovery, more accurately referred to as the hypothetical independent source rule,[3] is a constitutionally permissible exception to the exclusionary rule. Encompassed in that broad question are inquiries into the precise boundaries and requirements of the rule, and into the adequacy of the factual showing made by the State for invocation of the doctrine here.

■ Because the police used unlawful methods to obtain defendant's assistance in recovering the body of Pamela Powers, the fact of his assistance and his statements must be suppressed. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). It has long been the rule that evidence which is derived from such unlawfully gained statements must also be suppressed. *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963); *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). The Supreme Court has recognized two exceptions to this rule. The first, stated in *Silverthorne* itself, is that the Government may use such derivative evidence if knowledge of it was gained from an independent source. 251 U.S. at 392, 40 S.Ct. at 183, 64 L.Ed. at 321. The second, first recognized in *Nardone v. United States*, 308 U.S. 338, 341, 60 S.Ct. 266, 268, 84 L.Ed. 307, 312 (1939), and more fully developed in later cases,[4] allows use of such evidence whenever the connection between the primary illegality and the derivative evidence sought to be introduced has been so sufficiently attenuated that the taint is dissipat-

ed. The inevitable discovery rule which the State here proposes has never been recognized by the Supreme Court as a third exception to the *Silverthorne* rule. That Court has declined the opportunity to consider the rule's constitutionality on several occasions. *See, e. g., Fitzpatrick v. New York*, 414 U.S. 1050, 1051, 94 S.Ct. 554, 555, 38 L.Ed.2d 338, 339 (1973) (White, J., dissenting from denial of certiorari); Note, *The Inevitable Discovery Exception to the Constitutional Exclusionary Rules*, 74 Colum.L.Rev. 88, 91 n.22 (1974) [hereinafter cited as Columbia Note]. This, however, may change in the near future. *See United States v. Crews*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979) (granting certiorari to review *Crews v. United States*, 389 A.2d 277 (D.C.1978) (en banc), which rejected the rule, *id.* at 291–95, and reversed an armed robbery conviction). It was the subject of comment in *Brewer v. Williams*, 430 U.S. at 406 n.12, 97 S.Ct. at 1243, 51 L.Ed.2d at 441. For the moment, however, we are left to consider for ourselves the constitutional propriety of the inevitable discovery doctrine. We may call to our aid in this task a substantial body of law from lower federal courts and the courts of other states. In addition, we have the benefit of the opinions of several commentators on this subject.

The hypothetical independent source exception to the rule of exclusion has the support of a "vast majority" of all the courts which have considered it. 3 W. LaFave, *Search and Seizure* § 11.4, at 622 (1978). This includes six of the United States Courts of Appeals. *See United States v. Schmidt*, 573 F.2d 1057, 1065 n.9 (9th Cir.) (alternative rationale), *cert. denied*, 439 U.S. 881, 99 S.Ct. 221, 58 L.Ed.2d

---

**3.** As we shall explain, the rule is an extension of the independent source exception to the rule of exclusion found in *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920). And the word "inevitable" overstates the actual second requirement of the rule, which is that the State show by a preponderance of the evidence that the disputed evidence would have been found without the constitutional violation. Nevertheless, because of the overwhelming use of the phrase "inevitable

discovery" by other courts and commentators, we accede to that usage.

**4.** *United States v. Ceccolini*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Johnson v. Louisiana*, 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972); *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

194 (1978); *United States v. Ceccolini*, 542 F.2d 136, 140–41 (2d Cir. 1976), *rev'd on other grounds*, 435 U.S. 268, 98 S.Ct. 1054, 55 L.Ed.2d 268 (1978); *Owens v. Twomey*, 508 F.2d 858, 865–66 (7th Cir. 1974) (alternative rationale); *Virgin Islands v. Gereau*, 502 F.2d 914, 927–28 (3d Cir. 1974), *cert. denied*, 420 U.S. 909, 95 S.Ct. 829, 42 L.Ed.2d 839 (1975); *United States v. Seohnlein*, 423 F.2d 1051, 1053 (4th Cir.) (alternative rationale), *cert. denied*, 399 U.S. 913, 90 S.Ct. 2215, 26 L.Ed.2d 570 (1970); *Wayne v. United States*, 115 U.S.App.D.C. 234, 238, 318 F.2d 205, 209 (D.C.Cir.), *cert. denied*, 375 U.S. 860, 84 S.Ct. 125, 11 L.Ed.2d 86 (1963); *cf. United States v. Melvin*, 596 F.2d 492, 500 (1st Cir. 1979). *But see United States v. Schipani*, 414 F.2d 1262, 1266 (2d Cir. 1969), *cert. denied*, 397 U.S. 922, 90 S.Ct. 902, 25 L.Ed.2d 102 (1970); *United States v. Paroutian*, 299 F.2d 486, 489 (2d Cir. 1962) (rejecting as inadequate the Government's claim that evidence "might" have been discovered independently). *See also Somer v. United States*, 138 F.2d 790, 792 (2d Cir. 1943) (Learned Hand, J.). And the state courts which have recently been confronted with the issue appear to be nearly unanimous in their recognition and approval of the rule. *See, e. g., State v. Tillery*, 107 Ariz. 34, 39, 481 P.2d 271, 276 (en banc), *cert. denied*, 404 U.S. 847, 92 S.Ct. 151, 30 L.Ed.2d 84 (1971); *State v. Washington*, 120 Ariz. 229, 231, 585 P.2d 249, 251 (Ct.App.1978) (reciting but not applying inevitable discovery); *Lockridge v. Superior Court*, 3 Cal.3d 166, 170, 89 Cal. Rptr. 731, 734, 474 P.2d 683, 686 (1970), *cert. denied*, 402 U.S. 910, 91 S.Ct. 1387, 28 L.Ed.2d 652 (1971); *People v. Emanuel*, 87 Cal.App.3d 205, 214, 151 Cal.Rptr. 44, 50 (1978); *Sheff v. State*, 301 So.2d 13, 18 (Fla.Dist.Ct.App.1974), *aff'd on other grounds*, 329 So.2d 270 (1976); *People v. Pearson*, 67 Ill.App.3d 300, 308–10, 24 Ill. Dec. 173, 179–80, 384 N.E.2d 1331, 1337–38 (1978); *People v. Moore*, 55 Ill.App.3d 706, 711–12, 13 Ill.Dec. 499, 502–03, 371 N.E.2d 194, 197–98 (1977), *aff'd on other grounds*, 61 Ill.App.3d 694, 19 Ill.Dec. 15, 378 N.E.2d 516 (1978); *Leuschner v. State*, 41 Md.App. 423, 428, 397 A.2d 622, 626 (1979); *People v. Tucker*, 19 Mich.App. 320, 328–30, 172 N.W.2d 712, 717–18 (1969), *aff'd*, 385 Mich. 594, 189 N.W.2d 290 (1971), *acq. in result Michigan v. Tucker*, 417 U.S. 433, 94 S.Ct. 2357, 41 L.Ed.2d 182 (1974); *People v. Payton*, 45 N.Y.2d 300, 313–14, 408 N.Y.S.2d 395, 401–02, 380 N.E.2d 224, 230–31 (1978), *forma pauperis granted & probable jurisdiction noted*, 439 U.S. 1044, 99 S.Ct. 718, 58 L.Ed.2d 703 (1978); *People v. Fitzpatrick*, 32 N.Y.2d 499, 506–08, 346 N.Y.S.2d 793, 797–98, 300 N.E.2d 139, 141–42, *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973); *State v. McKendall*, 36 Or.App. 187, 192, 584 P.2d 316, 320 (1978) (applying inevitable discovery test codified in Or.Rev.Stat. § 133.683 (1977)); *Commonwealth v. Wideman*, 478 Pa. 102, 105, 385 A.2d 1334, 1336 (1978); *Ex parte Parker*, 485 S.W.2d 585, 589 (Tex.Cr.App.1972). *See also People v. Kusowski*, 403 Mich. 653, 662, 272 N.W.2d 503, 506 (1978) (separate opinion); Annot., 43 A.L.R.3d 385, 404–06 (1972); *cf. State v. Sickels*, 275 N.W.2d 809, 814 (Minn.1979).

Three appellate courts have clearly rejected the rule. *United States v. Houltin*, 525 F.2d 943, 949 (5th Cir.), *rehearing denied*, 533 F.2d 1135 (5th Cir. 1976) *vacated in part on other grounds mem. sub nom., Croucher v. United States*, 429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 745 (1977); *Parker v. Estelle*, 498 F.2d 625, 629 n.12 (5th Cir.), *rehearing denied*, 503 F.2d 567 (5th Cir. 1974), *cert. denied*, 421 U.S. 963, 95 S.Ct. 1951, 44 L.Ed.2d 450 (1975); *United States v. Castellana*, 488 F.2d 65, 68, *modified on other grounds en banc*, 500 F.2d 325 (5th Cir. 1974); *United States v. Peurifoy*, 22 C.M.A. 549, 552, 48 C.M.R. 34, 37 (1973); *Crews v. United States*, 389 A.2d 277, 291–95 (D.C.1978) (en banc), *cert. granted*, 440 U.S. 907, 99 S.Ct. 1213, 59 L.Ed.2d 454 (1979); *see United States v. Massey*, 437 F.Supp. 843, 853 n.3 (M.D.Fla.1977). *But see Gissendanner v. Wainwright*, 482 F.2d 1293, 1297 (5th Cir. 1973). And one other court has published an opinion which might be read either as an absolute rejection of the rule, or as a refusal to apply the rule to the facts of that case. *United States v. Griffin*, 502 F.2d 959, 960–61 (6th Cir.) (per

258

curiam), *cert. denied*, 419 U.S. 1050, 95 S.Ct. 626, 42 L.Ed.2d 645 (1974).

Two courts have held that the facts of the particular cases before them would not support application of the rule, and have reserved the issue for a proper case. *United States v. Kelly*, 547 F.2d 82, 86 (8th Cir. 1977); *State v. Ercolano*, 79 N.J. 25, 35–36, 397 A.2d 1062, 1067 (1979). It is interesting to note, however, that *Kelly* makes no mention of *United States v. DeMarce*, 513 F.2d 755, 758 (8th Cir. 1975), which appeared to make use of the doctrine without discussion. And at least one lower court in New Jersey has referred to inevitable discovery approvingly. *State v. Mather*, 147 N.J.Super. 522, 526–28, 371 A.2d 758, 761–62 (1977).

The commentators split more evenly on the constitutionality of the inevitable discovery doctrine. *Compare* 3 W. LaFave, *supra* § 11.4, at 620–28; LaCount & Girese, *The "Inevitable Discovery" Rule, An Evolving Exception To The Constitutional Exclusionary Rule*, 40 Alb.L.Rev. 483 (1976); Maguire, *How To Unpoison the Fruit—The Fourth Amendment and the Exclusionary Rule*, 55 J.Crim.L.C. & P.S. 307 (1964) (all approving the rule), *with* Pitler, *"The Fruit of the Poisonous 'Tree" Revisited and Shepardized*, 56 Calif.L.Rev. 579, 629–30 (1968); Comment, *Fruit of the Poisonous Tree: Recent Developments As Viewed Through its Exceptions*, 31 U.Miami L.Rev. 615, 626–29 (1977); Columbia Note, *supra* at 99–101; Comment, *Fruit of the Poisonous Tree—A Plea for Relevant Criteria*, 115 U.Pa.L.Rev. 1136, 1142–47 (1967) [hereinafter cited as Pa.Comment] (all criticizing the doctrine). *See also* Model Code of Pre-Arraignment Procedure § 290.2(5) (Proposed Official Draft, 1975) (proposing a codified version of the rule).

▮▮▮▮ On consideration of these authorities, we have determined that the position espoused by Professor LaFave is the one which conforms to the mandates of the Federal Constitution. Professor LaFave would have courts permit the use of inevitable discovery as an exception to the exclu-

sionary rule when the State has met a two part test. First, use of the doctrine should be permitted only when the police have not acted in bad faith to accelerate the discovery of the evidence in question. Second, the State must prove that the evidence would have been found without the unlawful activity and how that discovery would have occurred. Courts must use extreme caution to avoid applying the rule on the basis of hunch or speculation. We adopt this rule because it fits with the rationale of the two better established exceptions to the exclusionary rule, and because it meets the two most substantial complaints which are generally made by opponents of the inevitable discovery doctrine.

Although the inevitable discovery rule is probably best viewed as an expansion of the independent source exception which allows substitution of a hypothetical source for an actual one, 3 W. LaFave, *supra* § 11.4, at 620–21; Columbia Note, *supra* at 90, a better understanding of it can also be gained by examination of the history of the attenuation exception. In laying the groundwork for establishing the attenuation test in *Nardone*, Justice Frankfurter recognized that "[a]ny claim for the exclusion of evidence logically relevant in criminal prosecutions is heavily handicapped." 308 U.S. at 340, 60 S.Ct. at 267, 84 L.Ed. at 311. He observed two concerns which must be harmonized: "the stern enforcement of the criminal law" and the protection of the individual against governmental infringement on rights guaranteed by the Constitution.[5] *Id.* The Court sought to give effect to each of these competing interests by the application of the attenuation exception, which was referred to as "a matter of good sense." *Id.* at 341, 60 S.Ct. at 268, 84 L.Ed. at 312. So it is here as well. Those who argue against the inevitable discovery rule have failed to overcome the "heavy handicap" in their campaign to exclude relevant evidence. The rule is a "good sense" solution to the problem of balancing the interests involved. *See* Columbia Note, *supra* at 99 ("exception does make a certain pragmatic sense").

---

5. In this case we are concerned with protection of the sixth amendment right to counsel.

*Brewer v. Williams*, 430 U.S. at 398, 97 S.Ct. at 1239, 51 L.Ed.2d at 436.

Another helpful piece of attenuation history is found in *Wong Sun*, where the Court rejected a "but for" test. That is, the Court refused to "hold that all evidence is 'fruit of the poisonous tree' simply because it would not have come to light but for the illegal actions of the police." 371 U.S. at 487–88, 83 S.Ct. at 417, 9 L.Ed.2d at 455. The Seventh Circuit found from the quoted language and that which immediately followed that *Wong Sun* established the inevitable discovery rule. *Twomey*, 508 F.2d at 865–66. While we cannot agree that *Wong Sun* goes so far, *Wong Sun* is certainly consistent with, and poses no obstacle to, the adoption of an inevitable discovery test such as the one we have proposed. That which we find in *Wong Sun* is a justification for the inevitable discovery rule's lack of amenability to a mechanical application.

As already suggested, the version of the rule which we adopt also meets two of the most regularly heard complaints against the inevitable discovery rule. The first of these is that its use will defeat the purposes of the exclusionary rule. *See, e. g., Crews*, 389 A.2d at 293.

In *Brown v. Illinois*, 422 U.S. 590, 599–600, 95 S.Ct. 2254, 2259–60, 45 L.Ed.2d 416, 424–25 (1975), the Court recited the two regularly recognized purposes of the exclusionary rule: deterrence of lawless conduct by the police and protection of judicial integrity.[6] The opponents of the inevitable discovery doctrine claim that it frustrates the deterrence purpose by sanctioning "end runs and shortcuts." *Crews*, 389 A.2d at 293–94; *Castellana*, 488 F.2d at 68; Pa. Comment, *supra* at 1143. The fear seems to be that the police will proceed in an unlawful manner to hasten discovery of evidence on the assumption that it will be possible to persuade a judge at a later date that the evidence would have been found by lawful means in any event.

■ The answer to this objection is to include as an element of the inevitable discovery exception a requirement that the prosecution show that the police did not act in bad faith to hasten discovery of the questioned evidence. *Cf. Brown v. Illinois*, 422 U.S. at 605, 95 S.Ct. at 2262, 45 L.Ed.2d at 428 (referring to "purposefulness" of illegal police conduct). Obviously, bad faith means something more than just acting unlawfully, for if the police action was lawful the issue would never have arisen in the first place. And the question of bad faith may require different treatment, depending upon the nature of the lawless action taken by the police. That is, the initial unlawful activity might, for example, be a violation of either the fourth, the fifth or the sixth amendments. Police action taken solely to avoid the warrant clause of the fourth amendment, *see United States v. Griffin*, 502 F.2d at 960–61, *discussed approvingly in* 3 W. LaFave, *supra* § 11.4, at 624, might well provide a clear-cut case for refusal to apply the inevitable discovery exception. In such a situation the application of inevitable discovery would result in deletion of the warrant clause from the fourth amendment because that clause's sole purpose is to insert a magistrate between the proposed subject of a search and police officers who assert probable cause for the search. *See, e. g., Johnson v. United States*, 333 U.S. 10, 13–14, 68 S.Ct. 367, 369, 92 L.Ed. 436, 440 (1948). By this discussion we do not mean to intimate that violations of the fourth amendment will receive any greater or lesser scrutiny than violations of other constitutional safeguards. Rather, we intend only to illustrate what we mean when we refer to bad faith on the part of the police.

The second objection to inevitable discovery is "the ambiguity, subjectivity, and consequent potential for abuse inherent in its application." *Crews*, 389 A.2d at 294. This objection, however, does not go to the exception itself, or the exception in the abstract. Rather, it is an expression of concern that the rule may be applied in a "loose and unthinking fashion." 3 W. LaFave, *supra* § 11.4, at 623. The answer to

---

6. Of course, judicial integrity is not enhanced by an overzealous exclusion of relevant evidence.

the objection lies in part in our statement of the rule, and in part in the manner in which questions of this kind are reviewed by the appellate courts of this state.

In order to satisfy its burden, the State must show that the evidence *would* have been discovered. A showing that discovery *might* have occurred is entirely inadequate. Two points arise here. First, the State must show how the evidence would have been discovered. The precision required here will vary somewhat with the circumstances of the case. Situations in which the evidence was well hidden, or in which time would be a critical factor, would require a better showing on the part of the State as to exactly how or when discovery would have occurred. Second, a determination that a discovery would have come about must rest upon the record. Judges will not be permitted to supplement the record by reference to apparently similar cases in which evidence was discovered. *Commonwealth v. Wideman*, 478 Pa. at 107, 385 A.2d at 1337. This is not to deny the availability of judicial notice in appropriate cases, however.

The potential difficulties of ambiguity and subjectivity are also alleviated by the fact that the appellate courts of this state review such questions de novo. *State v. Ege*, 274 N.W.2d 350, 352 (Iowa 1979). Factual, as well as legal, determinations made by a single judge and questioned by one party or the other are open to full review by at least five persons of differing backgrounds and philosophies. A convergence of a majority of those viewpoints is good, and entirely adequate, protection against subjectivity and ambiguity.

The defendant also argues that if the exception is recognized the State should be required to meet a clear and convincing standard of proof, rather than a mere preponderance. The great weight of case law, however, supports the proposition that after the defendant has shown police conduct which is unconstitutional, the burden shifts to the State to demonstrate, by a preponderance of the evidence, that one of the exceptions to the exclusionary rule applies.

*Alderman v. United States*, 394 U.S. 165, 183, 89 S.Ct. 961, 972, 22 L.Ed.2d 176, 192 (1969); *United States v. Falley*, 489 F.2d 33, 41 (2d Cir. 1973); *cf. United States v. Matlock*, 415 U.S. 164, 177 n.14, 94 S.Ct. 988, 996, 39 L.Ed.2d 242, 253 (1974) (general statement regarding all suppression hearings); *Lego v. Twomey*, 404 U.S. 477, 486–87, 92 S.Ct. 619, 625–26, 30 L.Ed.2d 618, 626 (1972) (*Miranda* violation). On the basis of these authorities, we hold that the State's burden is met by a preponderance of the evidence.

In summary, then, we hold that the inevitable discovery rule is a constitutionally sound exception to the rule of exclusion first propounded in *Silverthorne*. After the defendant has shown unlawful conduct on the part of the police, the State has the burden to show by a preponderance of the evidence that (1) the police did not act in bad faith for the purpose of hastening discovery of the evidence in question, and (2) that the evidence in question would have been discovered by lawful means. This second element may require greater or lesser precision in showing the manner or time of discovery depending upon the circumstances of the case.

We now proceed to examine the facts of this case in the light of the standard just stated. Defendant has, of course, met his burden to show unconstitutional police conduct. That was established by the Supreme Court in *Brewer v. Williams*.

The first question, then, is whether the police acted in bad faith for the purpose of hastening discovery of the body of Pamela Powers. While there can be no doubt that the method upon which the police embarked in order to gain Williams's assistance was both subtly coercive and purposeful, and that its purpose was to discover the victim's body, *see* 430 U.S. at 393, 399, 97 S.Ct. at 1236–37, 1240, 51 L.Ed.2d at 433, 437, we cannot find that it was in bad faith. The issue of the propriety of the police conduct in this case, as noted earlier in this opinion, has caused the closest possible division of views in every appellate court which

has considered the question. In light of the legitimate disagreement among individuals well versed in the law of criminal procedure who were given the opportunity for calm deliberation, it cannot be said that the actions of the police were taken in bad faith.

Thus we proceed to consider the facts bearing on the second question: whether a preponderance of the evidence indicates that the body of Pamela Powers would have been found by lawful means, without the unlawfully obtained assistance of defendant.

On December 24, 1968, the family of Pamela Powers attended a wrestling tournament held at the YMCA in Des Moines. Pamela excused herself to go wash her hands before eating a candy bar. No one has been willing to acknowledge having seen her alive since.

Shortly after the disappearance of the Powers girl, and after a search for her had begun, defendant left the YMCA carrying a bundle which, observers later concluded, contained the body of Pamela Powers. Observers also obtained the license number of the green 1959 Buick in which he departed.

On December 25, two discoveries were made which gave some indication of the direction and route of defendant's flight from Des Moines. First, the car which he drove from the YMCA was discovered in Davenport, Iowa, which is located several hours east of Des Moines on Interstate 80. Later several items of clothing belonging to the victim, some clothing belonging to defendant, and an army blanket like that used to wrap the bundle which Williams carried out of the YMCA were found at a rest stop on Interstate 80 near Grinnell, between Des Moines and Davenport.

Police officials concluded that the items of clothing found at the Grinnell rest stop were probably among the last items to be taken from the Powers girl. They therefore came to the belief that Pamela Powers would be found somewhere in the Grinnell area, or west of Grinnell, in the direction of Des Moines. They also formed the opinion that she was probably somewhere near Interstate 80.

On that basis, a search was initiated on the 26th of December. Maps of Poweshiek and Jasper Counties were obtained. Grinnell is in Poweshiek County. Jasper County lies directly west of Poweshiek County. Polk County, in which Des Moines is located, lies directly west of Jasper County. Interstate 80 divides both Jasper and Poweshiek Counties into nearly perfect north and south halves.

On the two county maps, the Bureau of Criminal Investigation agent in charge of the search drew a grid pattern encompassing an area from roughly seven miles north of Interstate 80 to seven miles south of Interstate 80. The search thus began at the eastern border of Poweshiek County, twenty-one miles east of Grinnell, and moved westward. Teams of from four to six volunteers were each assigned to search an area on the gridded maps. Searchers were instructed to check all roads and ditches. While ditches were to be inspected from the road, searchers were told to get down and look into culverts. They were also instructed to search abandoned farm buildings and any other places where a small child could be secreted.

The agent in charge of the search testified at the suppression hearing that he had received reports that the searchers were following their instructions. This included getting down into ditches to look into culverts.

The search was called off at 3:00 p. m., when the BCI agents directing the volunteer searchers were told to meet Captain Leaming of the Des Moines Police Department at the truck stop near Grinnell. The cancellation was ordered because no officers remained to direct the search. In response to questions by the trial judge, the officer in charge of the search stated that he was "under the impression that there was a possibility that we could be led to the body at that time."

When the search ended at 3:00 p. m., it had been carried to the western edge of Jasper County, that is, the Jasper County-Polk County line. It was never resumed

because defendant led the police to the body of Pamela Powers. That body was in Polk County, two and one-half miles west of the Jasper County line. It rested next to a culvert in a ditch beside a gravel road which was about two miles south of Interstate 80.

The agent in charge of the search testified that had the body not been found by other means, the search would have continued west into Polk County, and that, in his opinion, the body would have been found within three to five hours after the search crossed the Jasper County-Polk County line.

It is not entirely clear, as defendant points out, when the search would have been reinitiated. It is clear, however, that the search would have proceeded into Polk County. We may infer from the testimony that it would have continued without hesitation, had the officers in charge not been called away. And, even after the interruption, the search would have begun again, although the precise time is not clear.

In light of the other facts, however, the precise time at which the search would have covered the area in which Pamela Powers's body lay was not of critical importance. The State produced an expert who testified that, based on the records of temperature from the month of December 1968 through the month of April 1969, the body of Pamela Powers would have been preserved in the state in which it was actually found until April of 1969. The only suggestion to the contrary came from testimony that the body had been disturbed by animals. This aspect, however, was not pursued at any length in the suppression hearing. Further, damage of that kind after nearly two days of exposure was minimal, suggesting that another two days, for instance, would have had little effect.

The State also introduced photographs showing the body as it was actually found. Those photographs show that Pamela Powers's body would not have been hidden by the inch of snow which accumulated in the area on the evening of December 26. The body was dressed in an orange and white striped blouse, which is what the officer who discovered the body saw first. In addition, the left leg of the body was poised in midair, where it would not have been readily covered by a subsequent snowfall.

It is true, as defendant argues, that Captain Leaming testified at the first trial that it took officers about five minutes to discover the body after Williams led them to the proper vicinity. While those officers did search on foot, Captain Leaming did not testify that any of them actually went down into the ditch.

Our review of the evidence leads to the conclusion that persons conducting a search such as the one which was conducted in Poweshiek and Jasper Counties and which was to be continued into Polk County would have found the body of Pamela Powers. Her body was frozen to the side of a cement culvert. It would have been nearly impossible for anyone who came down into the ditch to look into the culvert, as the searchers were doing, to fail to see the child's body. We thus conclude that as a result of the search which was underway, and which would have been continued, the body of Pamela Powers would have been found even in the absence of assistance by defendant. Further, that body would have been found in essentially the same condition it was in at the time of the actual discovery, so that all of the evidence which it actually yielded would have been available to the police.

Under the evidence adduced in this case, the State established by a preponderance of the evidence the manner and the time in which the discovery of Pamela Powers's body would have occurred. Trial court was correct in refusing to suppress evidence regarding the victim's body.

III. *Refusal to suppress evidence from car.* Defendant's next contention is that trial court erred in refusing to suppress evidence obtained in a search of the car which he used to transport himself to Davenport. His contention is that the search was improper because the magistrate who issued the search warrant did not endorse on the application the name of the police

officer who appeared and gave sworn testimony in support of the warrant, and did not include an abstract of that officer's testimony.

The parties are agreed that the affidavit which accompanied the application for search warrant was insufficient because it contained nothing except conclusory allegations. And the parties agree that the information which the police officer testified at the suppression hearing that he had given to the issuing magistrate in his sworn statement would have provided probable cause for issuance of the warrant.

 The issue, then, is whether the court hearing the motion to suppress could properly consider the oral testimony given to the magistrate, or if consideration of that testimony was foreclosed by the magistrate's failure to make an abstract of the oral statement.

The statutory provision which made such an abstract a requirement when oral testimony was relied upon to issue a warrant, an amendment to section 751.4, The Code 1966 (current version at § 808.3, The Code 1979), did not take effect until six months after the warrant in question was issued. But defendant contends that *State v. Spier*, 173 N.W.2d 854, 862 (Iowa 1970), relying upon *State v. Lampson*, 260 Iowa 806, 149 N.W.2d 116 (1967), made such an abstract a requirement prior to the effective date of the amendment to section 751.4, including the period during which the present warrant was issued. We reject this contention because *State v. Spier* was decided upon a lack of probable cause for the issuance of the search warrant. It did not turn upon whether oral testimony was endorsed on the warrant application. Nor did it rely upon *State v. Lampson* for the endorsement requirement.

*Spier* and *Lampson* both dealt with what is required to show probable cause when the police officer applying for the warrant is relying upon an informant. In *Lampson* the applying officer presented the magistrate with an oral statement which was essential to the warrant's issuance. 260 Iowa at 808–09, 812, 149 N.W.2d at 117, 119.

There is no indication in the opinion that the magistrate abstracted that statement. Certainly, that was not an issue in the case.

In *Spier*, this court relied upon *Lampson* for the proposition that a warrant may be issued on sworn testimony taken by the magistrate. 173 N.W.2d at 862. But *Spier* then went beyond *Lampson* to state a requirement that the magistrate make a written abstract of such testimony, and, if an informant is being relied upon, an abstract of the information showing that informant's reliability. This language, which served as a prelude to the holding that an abstract was required, clearly demonstrates that this court understood that the abstracting requirement was an addition to those of *Lampson* : "While reaffirming our stand in *Lampson*, supra, it is to us *now* apparent . . . ." (Emphasis added.)

No decision of this court has held the abstracting requirements of *Spier* to apply to a case which arose before the effective date of the amendment to section 751.4. Although the facts in *Spier* arose prior to that amendment, the standards which *Spier* sets out appear, in fact, to be *dicta* provided for the guidance of persons who would be required to operate under the requirements of the amendment to section 751.4. No other justification for the standard exists. No such requirement is imposed by the Constitution. *Campbell v. Minnesota*, 487 F.2d 1, 5 (8th Cir. 1973); *United States v. Berkus*, 428 F.2d 1148, 1152 (8th Cir. 1970). Because the statute upon which the *Spier* standard was based did not take effect until six months after the warrant in question was issued, defendant's contention is without merit.

 However, even if we were to assume that the *Spier* standard had some basis independent of the statute, we would decline to apply the holding of that case retroactively. The reliance of police officers on the state of the law as it stood in December 1968 was reasonable, and such a retroactive application would have a seriously derogatory effect on the administration of justice. *See Johnson v. New Jersey,*

384 U.S. 719, 727, 86 S.Ct. 1772, 1777–78, 16 L.Ed.2d 882, 888 (1966). Trial court's refusal to suppress evidence gained in the search of defendant's car was proper.

IV. *Publicity during trial.* The fourth division of defendant's brief raises two separate but related points. Both focus on the claim that the jury was exposed to publicity about the case during the trial.

A. The first point is an assertion that trial court committed error by refusing to sequester the jury during the entire trial, or, alternatively during its deliberations.

The defense made a motion well in advance of trial which recited that the case had been the subject of a great deal of publicity. It therefore requested three items of relief: change of venue, individual voir dire examinations of each potential juror, and sequestration of the jurors "from the point of selection forward." Trial court granted a change of venue and individual voir dire, but subsequently refused to sequester the jury. The court recited three reasons for that refusal. First, voir dire, and particularly individual voir dire, would enable the parties to select an impartial jury. Then, recognizing that sequestration of the jury during trial would be for the purpose of shielding it from publicity during the trial, the court opined that a jury which was impartial initially could be expected to remain so throughout the trial. Second, the trial was anticipated to run for as long as two weeks. That length of isolation "would reduce drastically the number of people who [could] fairly be expected to serve . . . ." Third, the court expressed concern and reservations about the potential effect of extended isolation on jurors and their ability to maintain their "common sense of balance," which is essential to the jury system.

At the end of the first day during which evidence was presented, trial court denied, "at this stage in the record," another motion, in which defendant requested that the jury be sequestered during its deliberations. The court expressed the view that voir dire had shown that the jurors appeared to have minds of their own on the case, that they appeared to be resolved to try the case on the evidence, and that there was no indication that they would violate their oaths.

Finally, during a recess near the end of defendant's presentation of his case, defendant again moved for sequestration during deliberations. In support, defense counsel recited the fact that newspapers in both Cedar Rapids and Des Moines had published the names of the jurors, in spite of a request by trial court that the list not be published. In addition, two wire services had carried the jury list. On that basis, the defense argued that the possibility of jurors' being improperly contacted was greatly increased.

The State, for the first time, opposed the motion to sequester. In answer to defendant's latter contention, it argued that because the jury was in public view while hearing the case, it had already been exposed to persons who were inclined to contact them. Additionally, the State argued that sequestration was for the distinct purpose of keeping jurors from seeing publicity about the case.

Trial court again denied the request. The court reminded counsel that in admonishing the jurors it had instructed them to report any improper attempts at contacting them. It also held open the possibility of making special inquiry of the jury as to whether any such contact had occurred.

On appeal, defendant contends that these three rulings by the trial court denied him the fair trial which he is guaranteed by the Federal Constitution. He places primary reliance on *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966). Reliance upon *Sheppard* at this stage in the proceedings is misplaced, however.

In *Sheppard*, the Supreme Court ordered that a writ of habeas corpus issue in favor of an Ohio state prisoner whose trial had been permeated by overreaching on the part of the press. That writ issued after a federal district court had held an evidentiary hearing which had produced five volumes of clippings from newspapers which had covered the case from the time of the crime

through the trial to the time of conviction. *Sheppard v. Maxwell*, 231 F.Supp. 37, 44, 72 (S.D.Ohio 1964), *rev'd*, 346 F.2d 707 (6th Cir. 1965), *rev'd*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966), *noted in id.* at 342, 86 S.Ct. at 1512, 16 L.Ed.2d at 608. In short, the Court had a full record upon which to base its conclusion that Sheppard had been denied a fair trial. In contrast to that full record, here we have nothing on which to base a judgment on such an issue.

We do not point up this difference to find fault in defendant's failure to produce such a record, at least with regard to the first motion. Obviously, the publicity from which a motion to sequester is designed to shelter the jury is publicity which occurs during trial. And, at the time of the first motion, defendant could not show such publicity without seeing into the future. The same is likely true of the second motion, because it was made so early in the trial process, and because it still had a view to the future: the deliberation period. But an evidentiary showing regarding publicity which had occurred during trial could have been made in conjunction with the third motion, and might have had some relevance regarding the likelihood of continued publicity during deliberations. Such a showing was never made.

Another way in which this case differs from *Sheppard* is that the Ohio trial court which originally tried Sheppard refused repeated motions for change of venue. 384 U.S. at 354 n.9, 86 S.Ct. at 1518, 16 L.Ed.2d at 615. This remedy for the effects of pre-trial publicity was granted here, although defendant later takes issue with the manner in which it was done.

For these reasons, we are not here confronted with the fair trial constitutional issue which defendant attempts to argue. Certainly, we are in no position to make an independent evaluation of the totality of the circumstances which *Sheppard* would require, 384 U.S. at 352, 362, 86 S.Ct. at 1517, 1522, 16 L.Ed.2d at 614, 620, and which defendant insists is appropriate. *See also State v. Jacoby*, 260 N.W.2d 828, 834 (Iowa 1977).

Instead, we can only review trial court's refusals to sequester the jury for an abuse of discretion. *State v. Lowder*, 256 Iowa 853, 864, 129 N.W.2d 11, 18 (1964), *cert. denied*, 380 U.S. 965, 85 S.Ct. 1110, 14 L.Ed.2d 155 (1965); § 780.19, The Code 1977 (current version at Iowa R.Crim.P. 18(5)(h)); Dunahoo, *The Scope of Judicial Discretion in the Iowa Criminal Law Process*, 58 Iowa L.Rev. 1023, 1066–67 (1973); *see State v. Johnson*, 216 N.W.2d 337, 339 (Iowa 1974); *cf. United States v. Carter*, 602 F.2d 799, 805 (7th Cir. 1979) (noting that most of the circuits allow the district court to permit separation of deliberating jury in the exercise of its discretion). Defendant argues in this regard that trial court gave only one reason for declining to sequester the jurors, and that the reason given was invalid as a matter of law, thus requiring a reversal. *See Farley v. Glanton*, 280 N.W.2d 411, 415 n.2 (Iowa 1979) (exercise of discretion based upon erroneous view of the law is error).

The contention is that trial court acted solely on the basis of avoiding inconvenience to jurors, and that this consideration was rejected in *Des Moines Register & Tribune v. Osmundson*, 248 N.W.2d 493, 500 (Iowa 1976). The argument has no merit for two reasons.

First, as our recitation of the facts shows, trial court listed several sound reasons for denying the motions.

Second, and more important, the trial judge did not base his judgment on a consideration of juror convenience such as that referred to in *Osmundson*. Defendant's characterization of trial court's comment that between one and two weeks of sequestration "would reduce drastically the number of people who can fairly be expected to serve . . ." as a reference to juror convenience is simply erroneous.

Trial courts have the discretion to excuse any juror for proper cause. *State v. Critelli*, 237 Iowa 1271, 1279–81, 24 N.W.2d 113, 117–18 (1947); § 607.3, The Code 1977. During voir dire, trial court's disposition of requests by veniremen that they be excused

demonstrated that the court was not inclined to grant such excuses lightly. Reading the court's statement of reasons for denying the motion to sequester in the light of the court's later conduct at voir dire leads us to conclude that trial court feared that a substantially greater number of persons could demonstrate that they would be "materially injured," see § 607.3, by sequestration than by the time requirements of attending the trial itself and the subsequent deliberations.

No abuse of discretion was shown at this juncture.

B. Defendant also complains in this division because trial court denied defendant's motion in arrest of judgment without a hearing. That motion raised the constitutional fair trial issue which has been alluded to immediately above, and sought an evidentiary hearing on the matter. We do not consider the propriety of trial court's ruling or the failure to hold a hearing because that court's jurisdiction was extinguished before the ruling was issued.

The motion in arrest of judgment was filed on October 14, 1977. Three days later, on the 17th, defendant filed his notice of appeal. Trial court did not rule on the motion until October 24. Defendant subsequently filed a notice of appeal from the ruling on the motion in arrest on November 23, 1977.

When defendant filed his notice of appeal on October 17 he cut off the jurisdiction of the district court to do anything except enforce the sentence if bail was not put in. *Cleesen v. Brewer,* 201 N.W.2d 474, 476 (Iowa 1972). Although a ruling on a motion in arrest of judgment is appealable under some circumstances, *State v. Hellickson,* 162 N.W.2d 390, 393 (Iowa 1968), that rule applies only when trial court adjudicates the motion while it still has jurisdiction.

This case is different from *State v. Gatewood,* 179 N.W.2d 520 (Iowa 1970). In that case, this court reviewed a ruling on a motion in arrest of judgment which was filed after the notice of appeal because trial

court had conducted a hearing on the motion and the merits of the issue could be litigated in any event in post-conviction relief proceedings. Here, of course, no hearing has been conducted. Thus nothing is to be gained by attempting to consider the matter in its present posture.

V. *Denial of motion for public opinion polls for use in selection of venue.* The fifth complaint which Williams makes is that he was denied effective assistance of counsel, due process and equal protection because trial court denied his request for funds to conduct public opinion polls in five Iowa counties other than Polk County. Those polls were to be for the purpose of selecting proper venue after trial court granted a change of venue.

Defendant, however, overstates the problem. The question is whether trial court denied him the means to avoid being tried in a county where, because of the dissemination of potentially prejudicial material, there was a reasonable likelihood that he could not receive a fair trial. *Pollard v. District Court,* 200 N.W.2d 519, 520 (Iowa 1972) (quoting ABA Project on Standards for Criminal Justice, Fair Trial and Free Press § 3.2(c) (Approved Draft 1968). Trial court did not so hinder him.

In fact, trial court granted a change of venue from Polk County to Linn County on the basis of potentially prejudicial publicity. If the same atmosphere had been shown to prevail in Linn County, it was open to defendant to petition for a second change of venue. *State v. Minski,* 7 Iowa 336 (1858). *See also* ABA Project on Standards for Criminal Justice, Fair Trial and Free Press § 3.2(e) (Approved Draft 1968). While *Minski* engaged in statutory construction, its rationale applies to sections 778.1–.10, The Code 1977 (current version at Iowa R.Crim.P. 10.2(f), .9(b). Section 778.5 was not to the contrary.

This complaint is without merit.

VI. *Denial of defendant's challenge for cause of prospective juror.* In this assignment, Williams insists that trial court erred by refusing to dismiss a juror who, defend-

ant claims, showed she could not try the cause impartially. Defendant removed the prospective juror by use of his fourth peremptory challenge. All of his peremptory challenges were exercised.

 We cannot base reversal on this assignment because the challenge was not sufficient to preserve any error. It did not specify the grounds upon which it was based. The full substance of it was: "we would challenge for cause. . . ." Under similar circumstances, this court held in *State v. Anderson,* 239 Iowa 1118, 1121–22, 33 N.W.2d 1, 3–4 (1948), that such a general statement did not entitle defendant to review of the question. This is in accord with the opening language of section 779.5, The Code 1977 (presently in Iowa R.Crim.P. 17(5)) ("A challenge for cause . . . must distinctly specify the facts constituting the causes thereof."), and a long line of case law. *See, e. g., Payne v. Waterloo, C. F. & N. Ry.,* 153 Iowa 445, 450, 133 N.W. 781, 783 (1911) (inference to be drawn from nature of examination of juror is not sufficient to preserve specific ground); *State v. Munchrath,* 78 Iowa 268, 270–71, 43 N.W. 211, 212 (1889). The failure to specify the cause prevents appellate consideration of both constitutional and statutory arguments. *State v. Jacoby,* 260 N.W.2d 828, 834 (Iowa 1977).

Even if the issue had been preserved, however, it is doubtful that reversal would have been mandated. Three principles govern our review of such questions. First, trial court is vested with broad, but not unlimited, discretion in ruling upon a challenge for cause. *State v. Winfrey,* 221 N.W.2d 269, 273 (Iowa 1974); *State v. Beckwith,* 242 Iowa 228, 232, 46 N.W.2d 20, 23 (1951); Dunahoo, *supra* at 1064–65. Second, a determination of a prospective juror's qualifications must rest upon the entire record of the examination. *See State v. Beckwith,* 242 Iowa at 238, 46 N.W.2d at 26. Third, the trial court sits as judge of the facts on the question of existence of a ground for challenge. *Tobin, Tobin & Tobin v. Budd,* 217 Iowa 904, 919, 251 N.W. 720, 727 (1934). Application of

these principles to the ruling now questioned would not have been likely to lead to reversal. Trial court warned defense counsel that the use of leading questions in examining the prospective juror was minimizing the value of her answers. The court evidently believed that counsel, both for the State and for the defense, had confused her, and that defense counsel was leading her into the appearance of being disqualified. That finding has some support in the record.

This in no way marks a retreat from the position enunciated in *State v. Beckwith,* 242 Iowa at 238–39, 46 N.W.2d at 26. We reiterate that there is no need for close rulings on the qualifications of jurors in criminal cases. "[T]rial courts should use the utmost caution in overruling challenges for cause in criminal cases when there appears to be a fair question as to their soundness." *Id.* at 238, 46 N.W.2d at 26. *See also* Dunahoo, *supra* at 1065.

The contention considered here, however, does not require reversal.

VII. *Denial of defendant's motion for directed verdict on issues of premeditation and deliberation.* Defendant argues that there was not sufficient evidence to submit the issues of premeditation and deliberation, two of the elements which distinguish first degree murder from second degree murder. Our review of this issue is governed by *State v. Overstreet,* 243 N.W.2d 880, 883–84 (Iowa 1976), except that, as appellate counsel for defendant concede, circumstantial evidence is considered in light of the revised standard of *State v. O'Connell,* 275 N.W.2d 197, 204–05 (Iowa 1979). *State v. Hillsman,* 281 N.W.2d 114, 115 (Iowa 1979).

 "To deliberate is to weigh in one's mind or to consider. To premeditate is to think or ponder upon a matter before action. Webster's International Dictionary." *State v. Fryer,* 226 N.W.2d 36, 41 (Iowa 1975). *See also* W. LaFave & A. Scott, *Handbook on Criminal Law* § 73, at 563 (1972) ("Perhaps the best that can be said of 'deliberation' is that it requires a cool mind that is capable of reflection, and of

'premeditation' that it requires that the one with the cool mind did in fact reflect, at least for a short period of time before his act of killing."). However, these elements need not exist for any particular length of time. *State v. Gilroy,* 199 N.W.2d 63, 66 (Iowa 1972).

Premeditation and deliberation may not be presumed, *State v. Fryer,* 226 N.W.2d at 41, but because they are mental elements they may be shown by circumstantial evidence. *State v. Lass,* 228 N.W.2d 758, 766 (Iowa 1975); *State v. Christie,* 243 Iowa 1199, 1207, 53 N.W.2d 887, 891, *modified,* 54 N.W.2d 927 (1952); 40 C.J.S. *Homicide* § 192, at 1092 (1944). They may not be inferred from intent. *State v. Phillips,* 118 Iowa 660, 677, 92 N.W. 876, 881–82 (1902). And the mere opportunity to premeditate and deliberate is not enough. *State v. Wilson,* 234 Iowa 60, 94, 11 N.W.2d 737, 754 (1943) ("The question is not only, Did the accused have time to think, but did he think?"). Because premeditation and deliberation are elements of first degree murder, the State must prove them beyond a reasonable doubt. *Mullaney v. Wilbur,* 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975).

When the State must rely upon circumstantial evidence of premeditation and deliberation, one or more of three categories of evidence frequently are used: "(1) evidence of planning activity of the defendant which was directed toward the killing; (2) evidence of motive which might be inferred from prior relationships between defendant and the victim; and (3) evidence regarding the nature of the killing." *State v. Harrington,* 284 N.W.2d 244, 248 (Iowa 1979) (citing *People v. Anderson,* 70 Cal.2d 15, 26–27, 73 Cal.Rptr. 550, 557, 447 P.2d 942, 949 (1968) (en banc); W. LaFave & A. Scott, *supra* § 73, at 564). Adequate evidence to support both submission of the issue and a subsequent conviction might come either solely from one category or from more than one. *Harrington,* 284 N.W.2d at 248.

The evidence at trial established that the victim had been sexually molested at the time of, or immediately after, her death. It also indicated that her death was caused by "lack of oxygen and anoxia, probably induced by some smothering mechanism." In the opinion of the medical examiner, the suffocation was caused by external means, something which covered the victim's mouth and nose.

Taking the evidence in the light most favorable to the State and drawing all fair inferences in favor of the jury's action, there was substantial evidence regarding the nature of the killing to justify submission to the jury of the issues of premeditation and deliberation. That panel would have been justified in concluding from the evidence that defendant apprehended Pamela Powers for the preconceived purpose of sexually molesting her, and that her death was a part of that coolly considered plan.

No error occurred here.

VIII. *Instructing on a theory which was not charged in the indictment.* Defendant was charged by an indictment which accused him "of the crime of murder as defined in Sections 690.1 and 690.2 of the 1966 Code of Iowa [in] that [defendant] . . . did with malice aforethought, premeditation, deliberation and intent to kill, murder Pamela Powers in Polk County, Iowa." He alleges that submission to the jury of a felony murder instruction containing the issue of whether Pamela Powers was killed in the perpetration of an attempted rape was a violation of his statutory and constitutional rights to be tried only on the offenses charged in the indictment.

Defendant first called this claimed error to trial court's attention in his motion for a new trial. An objection to an instruction may be urged in a motion for a new trial unless it has been expressly waived. *State v. Willis,* 250 N.W.2d 428, 430 (Iowa 1977) ("These are the only two objections to the instructions, Your Honor, that I did have," held to be such a waiver.). Here defendant did exactly that. First, defendant's objection to the felony murder instruction was founded only upon the

ground of insufficient evidence to support submission of the issue; the objection did not question the propriety of submitting the issue under the indictment. Then, after dictating his objections, counsel stated: "I think with the exception of our proposed instructions, Your Honor, that's all we have with regard to any objections and exceptions to your proposed instructions." Thus, the error now urged was waived. *Id.* Defendant's assertion, first raised on appeal, that this claimed error deprived him of due process will not avail him. "This court does not address issues, even of constitutional magnitude, not presented to the district court." *Estabrook v. Iowa Civil Rights Commission,* 283 N.W.2d 306, 311 (Iowa 1979).

In addition, we note that the federal constitutional argument which defendant makes in his initial brief is without merit. He there relies upon *Stirone v. United States,* 361 U.S. 212, 80 S.Ct. 270, 4 L.Ed.2d 252 (1960). But *Stirone* was based upon the fifth amendment guarantee against being held to answer for a federal felony "unless on a presentment or indictment of a Grand Jury." That provision of the Bill of Rights does not apply against the states. *Hurtado v. California,* 110 U.S. 516, 4 S.Ct. 111, 28 L.Ed. 232 (1884). And federal grand jury requirements are not imposed on states that choose to adopt grand jury systems. *Alexander v. Louisiana,* 405 U.S. 625, 633, 92 S.Ct. 1221, 1226–27, 31 L.Ed.2d 536, 543 (1972); *Watson v. Jago,* 558 F.2d 330, 337 (6th Cir. 1977). *But see Carter v. Jury Commission,* 396 U.S. 320, 330, 90 S.Ct. 518, 523–24, 24 L.Ed.2d 549, 557–58 (1970) (racial or national composition subject to federal scrutiny).

IX. *Instruction allowing jury to find defendant guilty of first degree murder without reaching agreement as to the precise nature of his acts.* Defendant next contends that the instruction defining first degree murder allowed the jury to convict him of that crime without necessarily reaching agreement as to what acts he performed to commit it. The instruction provided in pertinent part as follows:

Before the Defendant can be found guilty of such crime, the State must prove each of the following propositions:

A. That on or about December 24, 1968, in Polk County, Iowa, the defendant did wilfully and unlawfully kill Pamela Powers.

B. That such action on the part of the Defendant was done with malice aforethought.

C. That such action of the Defendant was done with deliberation, premeditation and with a specific intent to kill Pamela Powers; or,

Was done in the perpetration of the crime of Attempted Rape.

Stated in another way, defendant argues that because subparagraph C allows alternative theories, six jurors could have found that he killed Pamela Powers with deliberation, premeditation and specific intent to kill, while the other six could have rejected that hypothesis and found that it was done in the perpetration of an attempted rape. While he admits he has no federal constitutional right to a unanimous jury in a state criminal prosecution, *see Apodaca v. Oregon,* 406 U.S. 404, 92 S.Ct. 1628, 32 L.Ed.2d 184 (1972); *Johnson v. Louisiana,* 406 U.S. 356, 92 S.Ct. 1620, 32 L.Ed.2d 152 (1972), he contends that he is entitled to a more stringent standard than one allowing a six to six split.

The State points out, and defendant concedes, that this issue was not presented to trial court. Defendant argues, nevertheless, that trial court had the duty to instruct fully and fairly on all the issues, even without request, and that this court must review for a fair trial, regardless of whether an issue was preserved.

Defendant's contentions for review without preservation were considered and rejected in *State v. Sallis,* 262 N.W.2d 240, 248 (1978). Because this issue was not raised in the trial court, it cannot be effectively asserted here.

Even if we were to reach defendant's contention, however, we would not be inclined to agree with it. He relies

upon *United States v. Gipson,* 553 F.2d 453 (5th Cir. 1977). In that case, Gipson was charged with a violation of 18 U.S.C. § 2313, which prohibits the sale or receipt of stolen motor vehicles and aircraft. The trial court's instructions permitted the jury to find Gipson guilty if each individual juror found that he performed one of six prohibited acts—receiving, concealing, storing, bartering, selling or disposing—on a vehicle. 553 F.2d at 458. The court of appeals found that these six acts fell into two groups. The first three acts constituted one group, while the last three constituted the second. Within each group, the three listed acts were considered by the court of appeals to be "sufficiently analogous to permit a jury finding of the *actus reus* element of the offense to be deemed 'unanimous' despite differences among the jurors as to which of the intragroup acts the defendant committed." *Id.*

Assuming that we should apply the *Gipson* standard to the instruction complained of here, no infirmity has been shown to exist. First, *Gipson* focused on the *actus reus* element of the offense. The instruction complained of here allows alternative juror findings not on the *actus reus,* but on the mental elements of the crime of first degree murder. This is because felony murder is simply a specific method set apart by the legislature by which the prosecution may show that defendant was acting with the evil state of mind which is necessary to support a finding of first degree murder. *State v. Wilson,* 220 Kan. 341, 344–45, 552 P.2d 931, 935–36 (1976); *People v. Jackson,* 20 N.Y.2d 440, 450, 285 N.Y.S.2d 8, 17–18, 231 N.E.2d 722, 729–30 (1967), *cert. denied,* 391 U.S. 928, 88 S.Ct. 1815, 20 L.Ed.2d 668 (1968). Thus the *actus reus,* which is what *Gipson* focused on, is identical for either type of first degree murder. That is, the jury, under either theory, had to find that defendant killed Pamela Powers.

Second, assuming that the *Gipson* standard might be taken beyond the *actus reus* to apply to mental elements, the mental elements here are sufficiently analogous to meet the *Gipson* standard. Under section 690.2, The Code 1966 (current version at § 707.2, The Code 1979), it was necessary for the State to show that defendant committed murder in the perpetration of a felony. The mere showing of a killing was insufficient. *State v. Conner,* 241 N.W.2d 447, 463 (Iowa 1976). Thus, malice aforethought is a required element of felony murder as well as of the type of first degree murder which must be deliberate and premeditated. *State v. Galloway,* 275 N.W.2d 736, 737–38 (Iowa 1979). And, as demonstrated above, a showing that the murder occurred in the perpetration of a felony is merely a particular statutorily prescribed method for showing the mental elements of deliberation and premeditation.

Several other state courts have reached this same result. *See People v. Chavez,* 37 Cal.2d 656, 670–72, 234 P.2d 632, 641–42 (1951) (en banc); *State v. Souhrada,* 122 Mont. 377, 384–85, 204 P.2d 792, 796 (1949); *People v. Sullivan,* 173 N.Y. 122, 127–30, 65 N.E. 989, 990 (1903). *People v. Olsson,* 56 Mich.App. 500, 224 N.W.2d 691 (1974), cited by defendant in support of his position, is simply not persuasive.

Reversal cannot be predicated on this ground.

X. *Ineffective assistance of counsel.* Defendant claims that his trial counsel were ineffective in two respects: because they advised him not to testify in his own behalf, and because they failed to introduce the testimony of a witness which he claims supported his theory of the case. Our disposition of his claims only requires that we explain them briefly.

Defendant's factual theory was that Pamela Powers had been molested and murdered by another person. That other person left her body in defendant's room, where defendant found it. Fearful of being accused of the murder, defendant carried the body out of the YMCA and hid it in the ditch where it was found two days later.

Defendant now argues that for that theory to be believable, he should have testified in his own behalf. To remove the decision

from the realm of trial tactics, defendant contends that the reasons which trial counsel gave for recommending that defendant not testify, which were made a part of the record, were inadequate as a matter of law. He also complains that the testimony of a witness which was available in deposition form and which he contends supports his factual theory of the case was not introduced at trial.

Recently, we have been extremely reluctant to adjudicate claims of ineffective assistance on direct appeals. This reluctance has been due to the lack of full development of the facts surrounding the representation complained of. There has been increasing concern that the State and the attorneys whose effectiveness is being attacked should have an opportunity to rebut allegations of ineffectiveness. *See State v. Smith,* 282 N.W.2d 138, 143–44 (Iowa 1979); *State v. O'Connell,* 275 N.W.2d 197, 205–06 (Iowa 1979); *State v. Coil,* 264 N.W.2d 293, 296 (Iowa 1978). *See also State v. Barber,* 301 So.2d 7, 9 (Fla.1974); *State v. Bosler,* 432 S.W.2d 237, 239 (Mo.1968); *Commonwealth v. Wade,* 480 Pa. 160, 172–74, 389 A.2d 560, 566–67 (1978) (remand from direct appeal ordered for evidentiary hearing on ineffective assistance). We therefore decline to consider whether defendant's counsel were ineffective. His right to raise that issue by postconviction proceedings, ch. 663A, The Code, is reserved.

XI. *The Polk County Medical Examiner's change of opinion.* In his final assignment of error, defendant argues that trial court should have held an evidentiary hearing on his motion in arrest of judgment. That motion alleged, in the division relevant here, that Dr. R. C. Wooters, the Polk County Medical Examiner, changed his medical opinion on a subject which was critical to the defendant only shortly before defendant was to call him to testify. This, in defendant's opinion, denied him a fair trial.

We, however, do not reach the issue. This is another division of the motion in arrest of judgment discussed above, in division IV B. As explained there, trial court's jurisdiction was terminated before it ruled on this motion. Thus we have nothing to review.

We have considered all of the issues presented for review, whether specifically discussed or not, and none warrants a reversal. Defendant's conviction stands affirmed.

AFFIRMED.

All Justices concur except HARRIS, J., who concurs in result.